IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FORT SMITH DIVISION

STACEY MORRIS o/b/o
K. M. (a minor) and
MICHAEL MORRIS (deceased)                                    PLAINTIFF


         V.                 Civil No. 2:18-cv-02068-PKH-MEF


NANCY A. BERRYHILL, Commissioner
Social Security Administration                                DEFENDANT


**MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION**

Plaintiff, Stacey Morris, brings this action on behalf of K. M., a minor child and next of kin to Michael Morris, deceased, under 42 U.S.C. § 405(g), seeking judicial review of a decision of the Commissioner of the Social Security Administration ("Commissioner") denying his claim for a period of disability and disability insurance benefits ("DIB") under Title II of the Social Security Act (hereinafter "the Act"), 42 U.S.C. § 423(d)(1)(A). In this judicial review, the Court must determine whether there is substantial evidence in the administrative record to support the Commissioner's decision. *See* 42 U.S.C. § 405(g).

### I.    BACKGROUND

Plaintiff protectively filed his application for DIB on April 16, 2014, alleging an onset date of April 14, 2014, due to insulin dependent diabetes, knee and hand pain, social anxiety, attention deficit hyperactivity disorder ("ADHD"), bipolar disorder, methicillin resistant staphylococcus aureus ("MRSA"), and substance abuse. (ECF No. 10, pp. 128, 239-247, 267-268). Based on his work credits, the Commissioner determined that the Plaintiff met the insured status requirements of the Act through March 30, 2017. (*Id*. at 21).

Plaintiff's application was denied at both the initial and reconsideration levels. An administrative hearing was held on July 27, 2016. (*Id*. at 51-107). Plaintiff was present and represented by counsel.

On October 18, 2016, the ALJ concluded that the Plaintiff's insulin dependent diabetes mellitus, history of left knee surgery, history of left elbow fracture, ADHD, bipolar disorder, adjustment disorder, panic disorder, other specified personality disorder with mixed features, and history of polysubstance abuse were severe but did not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4. (*Id*. at 22). The ALJ found Plaintiff capable of performing a full range of work at all exertional levels, but with the following non-exertional limitations: can never climb ladders, ropes or scaffolds; can occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl; should avoid concentrated exposure to temperature extremes, particularly extreme heat; should avoid even moderate exposure to hazards, including not driving as part of work; and, is able to perform work where the interpersonal contact is incidental to work performed, the complexity of tasks is learned and performed by rote with few variables and little judgment involved, and the supervision required is simple, direct, and concrete. (*Id*. at 24). With the assistance of a vocational expert, the ALJ determined Plaintiff could perform work as a machine packager, busboy, routing clerk, marking clerk, document preparer, and pari-mutuel ticket checker. (*Id*. at 30).

The request for review was denied by the Appeals Council on February 1, 2018, and the ALJ's decision became the Commissioner's final decision for judicial review. (*Id*. at 6-12).

Plaintiff then filed this action. (ECF No. 1). This matter is before the undersigned for report and recommendation. Both parties have filed appeal briefs (ECF Nos. 12, 13), and the case is now ready for decision.

## II.     APPLICABLE LAW

This Court's role is to determine whether substantial evidence supports the Commissioner's findings. *Vossen v. Astrue*, 612 F.3d 1011, 1015 (8th Cir. 2010). Substantial evidence is less than a preponderance, but it is enough that a reasonable mind would find it adequate to support the Commissioner's decision. *Teague v. Astrue*, 638 F.3d 611, 614 (8th Cir. 2011). We must affirm the ALJ's decision if the record contains substantial evidence to support it. *Blackburn v. Colvin,* 761 F.3d 853, 858 (8th Cir. 2014). So long as there is substantial evidence in the record that supports the Commissioner's decision, the Court may not reverse it simply because substantial evidence exists in the record that would have supported a contrary outcome, or because the Court would have decided the case differently. *Miller v. Colvin*, 784 F.3d 472, 477 (8th Cir. 2015). In other words, if after reviewing the record it is possible to draw two inconsistent positions from the evidence and one of those positions represents the findings of the ALJ, we must affirm the ALJ's decision. *Id*.

A claimant for Social Security disability benefits has the burden of proving his disability by establishing a physical or mental disability that has lasted at least one year and that prevents him from engaging in any substantial gainful activity. *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001); *see also* 42 U.S.C. § 423(d)(1)(A). The Act defines "physical or mental impairment" as "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable

3

clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d)(3). A Plaintiff must show that his disability, not simply his impairment, has lasted for at least twelve consecutive months.

The Commissioner's regulations require her to apply a five-step sequential evaluation process to each claim for disability benefits: (1) whether the claimant has engaged in substantial gainful activity since filing his claim; (2) whether the claimant has a severe physical and/or mental impairment or combination of impairments; (3) whether the impairment(s) meet or equal an impairment in the listings; (4) whether the impairment(s) prevent the claimant from doing past relevant work; and, (5) whether the claimant is able to perform other work in the national economy given his age, education, and experience. 20 C.F.R. § 404.1520(a)(4). Only if he reaches the final stage does the fact finder consider the Plaintiff's age, education, and work experience in light of his residual functional capacity. *McCoy v. Schweiker*, 683 F.2d 1138, 1141-42 (8th Cir. 1982), *abrogated on other grounds by Higgins v. Apfel*, 222 F.3d 504, 505 (8th Cir. 2000); 20 C.F.R. § 404.1520(a)(4)(v).

### III. DISCUSSION

Plaintiff raises three issues on appeal: (a) whether the ALJ fully and fairly developed the record; (b) whether the ALJ failed to properly evaluate the Plaintiff's subjective complaints and apply the *Polaski* factors; and, (c) whether the ALJ's RFC determination is supported by substantial evidence. Of concern to the undersigned is the ALJ's RFC determination. RFC is the most a person can do despite that person's limitations. 20 C.F.R. § 404.1545. "The ALJ determines a claimant's RFC based on all relevant evidence in the record, including medical records, observations of treating physicians and others, and the claimant's own descriptions of his or her limitations." *Jones v. Astrue*, 619 F.3d 963, 971 (8th Cir. 2010); *Davidson v. Astrue*,

4

578 F.3d 838, 844 (8th Cir. 2009). The United States Court of Appeals for the Eighth Circuit has held that a "claimant's residual functional capacity is a medical question." *Miller*, 784 F.3d at 479 (citing *Lauer v. Apfel,* 245 F.3d 700, 704 (8th Cir. 2001). Thus, an ALJ's determination concerning a claimant's RFC must be supported by medical evidence that addresses the claimant's ability to function in the workplace. *Perks v. Astrue*, 687 F.3d 1086, 1092 (8th Cir. 2012).

In the present case, the ALJ failed to properly consider the relationship between the Plaintiff's bipolar disorder, drug abuse, and his diabetes. According to the Diagnostic and Statistical Manual of Mental Disorders, co-occurring mental disorders are common in patients suffering from bipolar I disorder, with one of the most common comorbid disorders being substance use disorder. DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS 5 ("DSM 5"), 132 (5th ed. 2013). In fact, substance use disorders have been found to occur in over half of the individuals with bipolar I disorder. *Id*. And, some research suggests that bipolar disorder may actually precipitate substance abuse as a means by which the sufferer tries to alleviate their symptoms. Frederick K. Goodwin & Kay Redfield Jamison, Manic-Depressive Illness 219-25 (2d ed. 1990); Li-Tzy Wu et al., "Influence of Comorbid Alcohol and Psychiatric Disorders on Utilization of Mental Health Services in the National Comorbidity Survey," 156 *Am. J. Psychiatry* 1235 (1999); Edward J. Khantzian, "The Self-Medication Hypothesis of Addictive Disorders: Focus on Heroin and Cocaine Dependence," 142 *Am. J. Psychiatry* 1259, 1263 (1985). Treatment non-compliance is also common among bipolar patients, as they suffer from anosognosia, or poor insight into their illness. DSM 5, 129. Federal courts have recognized that a mentally ill person's

noncompliance with psychiatric medications can be, and often is, caused by the underlying mental impairment and, therefore, is "neither willful nor without a justifiable excuse." *Pate-Fires v. Astrue*, 564 F.3d 935, 945 (8th Cir. 2009) (citing *Mendez v. Chater*, 943 F.Supp. 503, 508 (E.D. Pa. 1996); *Sharp v. Bowen*, 705 F.Supp. 1111, 1124 (W.D. Pa. 1989); *Frankhauser v. Barnhart*, 403 F.Supp.2d 261, 277-78 (W.D.N.Y. 2005); *Brashears v. Apfel*, 73 F.Supp.2d 648 650-52 (W.D. La. 1999) (each holding ALJ must consider whether a claimant's failure to comply with treatment results from his/her bipolar disorder, schizophrenia, and/or schizoaffective disorder)).

The Plaintiff was hospitalized on approximately five occasions for diabetic ketoacidosis ("DKA"), a life-threatening complication of Type 1 diabetes in which the patient's blood sugar levels are very high and acidic substances called ketones build up to dangerous levels in the body. (ECF No. 10, pp. 375-404, 411-433, 659-726, 872-967, 968-993, 999-1044). Mayo Clinic, *Diabetic ketoacidosis*, *at* https://www.mayoclinic.org/diseases-conditions/diabetickeotacidosis/symptoms-causes/syc-203271551 (last accessed February 19, 2019). And, sadly, counsel suggests the Plaintiff ultimately succumbed to this complication after the ALJ rendered his unfavorable decision. Admission records dated June 2015 indicate Plaintiff was a notorious drug abuser with a history of polysubstance dependence to include methamphetamine, cannabis, and alcohol abuse, causing estrangement from family, domestic violence ultimately resulting in criminal prosecution, divorce, and the loss of custody of his young son, bipolar disorder, and non-compliance with treatment for both his diabetes and bipolar disorders. (*Id*. at 999-1044). The admitting doctor was very familiar with the Plaintiff, having treated him on multiple occasions, including once for a self-inflicted knife injury to the

neck in 2011. And, the doctor noted Plaintiff was known to binge use methamphetamine intravenously and then not take his insulin for days or weeks at a time. As a result, he would spiral into DKA and require emergency treatment. Plaintiff was hospitalized April 11-13, 2014; September 27-30, 2014; June 8-11, 2015; January 13-15, 2016; June 26-29, 2016; and, May 24, 2017 for DKA episodes. Further, at the time of his September 2014 hospitalization, Plaintiff had also taken approximately 51 Klonopin the previous evening to "help him sleep." (*Id*. at 659-726). Despite his denial that this was a suicide attempt, Plaintiff's father reported he had made three recent suicide attempts and indicated he was trying to obtain a mental commitment order for his son.

Plaintiff also received extensive outpatient treatment for his bipolar disorder through Valley Behavior Health Systems ("VBHS"). Records dated between 2011 and April 2015 document Plaintiff's treatment with Dr. Fayz Hudefi and his staff at VBHS. (*Id*. at 537, 543-545, 728-729, 769-771, 772-780). Treatment notes indicate that the Plaintiff reported doing well at times and participated fully in group therapy. These periods also appear to coincide with time periods when he was more complaint with his diabetic treatment and avoided episodes of DKA. (*Id*. at 506-509, 743-754). However, at other times, he was depressed and less interactive in therapy, which appears to have caused him to abuse various substances and to be noncompliant with both his bipolar and diabetes treatments. On April 22, 2015, Plaintiff presented for group therapy reportedly in Oxycontin withdrawal. (*Id*. at 772). He was disruptive and difficult to redirect. His counselor noted he made limited overall progress toward his treatment plan goals and objectives due to poor attendance. And, on May 4, 2015,

Plaintiff was discharged due to non-compliance. (*Id*. at 761). On June 8, 2015, little more than one month later, Plaintiff was again hospitalized for an episode of DKA.

In January 2016, Plaintiff began treatment at Western Arkansas Counseling and Guidance Center. (*Id*. at 110-116, 124-125). As previously mentioned, records reveal a hospitalization for DKA on January 13-15, 2016. Plaintiff was discharged from WACGC in February 2016, at his own request, after an intake screen was positive for methamphetamine, amphetamine, and benzodiazepines. (*Id*. at 116).

The Plaintiff also had one unsuccessful attempt at drug and alcohol treatment during the relevant period. From July 18-22, 2014, he was hospitalized at Springwoods Behavioral Health. (*Id*. at 551-563). He had reportedly been using methamphetamine intravenously daily since February. Unfortunately, he skipped 90% of the group sessions and slept throughout the course of his admission. He was discharged because he was neither suicidal nor compliant. The day following his release, Plaintiff was admitted to Pacific Hills Treatment Centers. It appears he remained there until approximately August 16, 2014. (*Id*. at 640-642). Although he may have temporarily ceased his drug use, as is clearly evidenced by other records in this case, the remission did not last.

Thus, despite the evidence indicating that the Plaintiff's bipolar and substance abuse disorders contributed to his failure to take his insulin as prescribed and resulted in his episodes of DKA, the ALJ failed to consider whether the Plaintiff's substance abuse disorder was a factor material to the determination of his disability. In fact, the ALJ concluded, even taking his substance abuse into account, that the Plaintiff was not disabled. It is clear from the record, however, that the Plaintiff, at least while using a substance, was clearly disabled. To what

extent he was disabled while clean and sober, however, is a question that has yet to be clearly answered.

The ALJ dismissed the mental RFC assessment of Plaintiff's treating psychiatrist, Dr. Fayz Hudefi, alleging he failed to provide any objective findings to support his opinion, his opinion was more severe than the objective findings indicated, and Dr. Hudefi had not treated the Plaintiff for more than a year prior to the rendering of the opinion. Dr. Hudefi, however, is the Medical Director at VBHS. Although he may not have personally treated the Plaintiff each time he presented for care, Dr. Hudefi was a member of the team in charge of the Plaintiff's bipolar treatment. *See Lacroix v. Barnhart*, 465 F.3d 881, 886 (8th Cir. 2006) (discussing treatment of opinions of nurse practitioner, counselor, and medical doctor who worked as a treatment team). Further, progress notes from both the counselors and nurse practitioners provide ample objective documentation of the Plaintiff's progress to support Dr. Hudefi's opinion. In fact, these records contain far more objective support and cover a longer period of time than do both the consultative examination conducted by Dr. Terry Efird and the non-examining consultative opinions the ALJ relies on to conclude the Plaintiff can perform unskilled work without further limitations.

In February 2015, Dr. Hudefi concluded Plaintiff had no useful ability to function on a sustained basis in the following areas: remember locations and work-like procedures; understand, remember, and carry out very short and simple instructions; maintain attention and concentration for extended periods; perform activities within a schedule; maintain regular attendance, or be punctual within customary tolerances; respond appropriately to supervision, co-workers, and usual work settings; work in coordination with or proximity to others without

9

being distracted by them; complete a normal workday and workweek without interruptions from psychologically based symptoms; perform at a consistent pace without an unreasonable number and length of rest periods; maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness; respond appropriately to changes in the work setting; set realistic goals or make plans independently of others; behave in an emotionally stable manner; demonstrate reliability; work without deterioration or decompensation causing the individual to withdraw from the situation; and, work without deterioration or decompensation causing exacerbation of symptoms or adaptive behaviors. (*Id*. at 736, 796). Additionally, he assessed Plaintiff with a global assessment of functioning (GAF) score of 31-40, which is indicative of some impairment in reality testing or communication (*i.e.*, speech is at times illogical, obscure, or irrelevant) or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (*e.g.*, depressed, avoids friends, neglects family, and is unable to work, child frequently beats up younger children, is defiant at home, and is failing at school). (*Id*. at 737-738, 797-798). The undersigned realizes, of course, that this assessment makes no mention of the Plaintiff's alcohol/drug abuse; the connection between his bipolar disorder, substance abuse disorder, and diabetes; or, what the Plaintiff's level of functioning would be if it were possible to remove his substance abuse from the equation.

Thus, on remand, the ALJ should be ordered to recontact Dr. Hudefi to request clarification of his opinion. Dr. Hudefi should be asked the following questions:

(1) What is the relationship between the Plaintiff's bipolar disorder, substance abuse disorder, and diabetes, and the Plaintiff's treatment noncompliance with each?

(2) What is the Plaintiff's RFC given all of his impairments?

(3) Is it possible to separate the Plaintiff's substance abuse disorder from his other impairments?

(4) If so, what is the Plaintiff's RFC if the substance abuse is removed?

Because the Plaintiff is now deceased, a consultative examination cannot be ordered. Therefore, if Dr. Hudefi is unable or otherwise unwilling to provide this information, the ALJ should be directed to submit the Plaintiff's medical records to a medical expert, namely a psychiatrist, to review and then answer the same questions posed to Dr. Hudefi. The expert should, however, provide the objective bases for each of his answers. A simple check-box form will not suffice. The ALJ should also call the medical expert to testify at the hearing on remand, allowing counsel for the Plaintiff the opportunity to question the witness.

### IV. CONCLUSION

Based on the foregoing, I recommend reversing and remanding this case to the Commissioner for further consideration pursuant to sentence four of 42 U.S.C. § 405(g).

**The parties have fourteen (14) days from receipt of this report and recommendation in which to file written objections pursuant to 28 U.S.C. § 636(b)(1). The failure to file timely objections may result in waiver of the right to appeal questions of fact. The parties are reminded that objections must be both timely and specific to trigger de novo review by the district court.**

DATED this 21st day of February 2019.

/s/ Mark E. Ford
HONORABLE MARK E. FORD
UNITED STATES MAGISTRATE JUDGE